# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

HAROLD HARTER,

      Plaintiff

v.

JOHN DIMURO, et. al.,

      Defendants

Case No.: 3:18-cv-00048-RCJ-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 70

This Report and Recommendation is made to the Honorable Robert C. Jones, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 70, 70-1 to 70-13, 72-1, 77-1.) Plaintiff filed a response (ECF No. 78), and Defendants filed a reply (ECF No. 81).

After a thorough review, it is recommended that the motion be granted in part and denied in part.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Am. Compl., ECF No. 54.) The events giving rise to this action took place while Plaintiff was housed at Lovelock Correctional Center. (*Id.*) Defendants are Frank Albrecht, Mary Boni, Michelle Cowee, John Dimuro, Kimberly Egbert, Heather Ellis, Maribelle Henry, and Esther Paredes.

Plaintiff filed his original complaint asserting violation of his rights related to his low sodium diet that was prescribed due to his chronic hypertension. He alleged that he was provided a diet that was not low in sodium, and that his diet was calorically inadequate. (ECF No. 4.) On screening, the court allowed him to proceed with an Eighth Amendment claim for deliberate indifference to a serious medical need based on allegations that he was provided a diet that was not low in sodium against Albrecht, Boni, Dr. Dimuro, Egbert, Ellis, Henry, Paredes, and Jane Doe 1, when he learned her identity. The claim based on the allegation that his diet was calorically inadequate was dismissed with leave to amend.  (ECF No. 3.)

Plaintiff indicated that he did not wish to proceed with the claim based on the calorie content of his diet (ECF No. 5); therefore, the court ordered that the complaint would proceed only on the claim related to the low sodium diet. (ECF No. 6.)

Plaintiff subsequently filed a motion for an enlargement of time to file and serve an amended complaint to name the person sued as Jane Doe 1. The court gave Plaintiff 60 days to file a motion seeking to substitute the name of a specific individual for the Doe defendant. Alternatively, Plaintiff was advised that if he sought to amend beyond substitution of a party, he was required under Local rule 15-1 to submit a proposed amended complaint which would have to be screened. (ECF No. 53.)

Plaintiff filed a first amended complaint, which is identical to the original complaint except that it names Michelle Cowee in place of Jane Doe 1 in Count V. (ECF No. 54.) Since the first amended complaint did not make substantive changes to the allegations, the court did not

screen the first amended complaint. An answer was filed by Defendants (ECF No. 55), and

Cowee joined in the answer after she was served (ECF No 65).[1]

Defendants now move for summary judgment arguing that most of the defendants had no

interaction with Plaintiff or no involvement with the conduct that gives rise to Plaintiff's claim,

and the menus are planned with the assistance of a dietician and are appropriate for this setting.

In addition, they contend that during the time period in question, Plaintiff purchased items from

the canteen for personal use that have elevated sodium levels. They maintain that Plaintiff has

not suffered any medical damage related to the food provided at LCC. Finally, they argue they

are entitled to qualified immunity.[2]

Plaintiff argues that the diet served at LCC does not comply with federal guidelines, and

he has suffered exacerbated medical issues related to the food he was provided.

Defendants motion and Plaintiff's response both mention the claim that Plaintiff's diet

was not low in sodium, and that it was calorically inadequate, but the latter claim was dismissed

and Plaintiff elected not to amend in that regard. Therefore, this Report and Recommendation

will focus only on the former claim, as it is the only claim proceeding in this action.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary

judgment when "the movant shows that there is no genuine issue as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*

---

[1] The joinder states that it is to the answer to the original complaint (ECF No. 37), instead of the answer to the amended complaint (ECF No. 65).

[2] Defendants also contend that Plaintiff filed and settled a claim in State court related to his low sodium diet; however, Defendants do not include any substantive argument about this case or its settlement. For example, they do not make any res judicata argument relative to the State court case.

*v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went

4

uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing

the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

*Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

party cannot establish an element essential to that party's case on which that party will have the

burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to

establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

be shown to require a jury or judge to resolve the parties' differing versions of truth at trial."

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

(quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment

by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475

U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

pleadings and set forth specific facts by producing competent evidence that shows a genuine

dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

## III. DISCUSSION

**A. Eighth Amendment**

A prisoner can establish an Eighth Amendment violation arising from deficient medical

care if he can prove that prison officials were deliberately indifferent to a serious medical need.

*Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104);  *see also Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted) (finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted).

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Instead, to establish deliberate indifference in the context of a difference of opinion between a physician and the prisoner or between medical providers, the prisoner "'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Moreover, under the Eighth Amendment, food does not need to be tasty or aesthetically pleasing, but it does need to be adequate to maintain health. *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993) (citation omitted).

Defendants concede, for purposes of their motion, that Plaintiff suffered from a serious medical need: chronic hypertension; therefore, the court's analysis will focus on the subjective prong of the deliberate indifference inquiry.

**B. Dr. Dimuro**

Dr. Dimuro was the Chief Medical Officer for the State of Nevada from July 2016 to October 2017. (Dimuro Decl., ECF No. 70-12.) He did not have direct supervision over the

prison culinary department. (*Id.* ¶ 6.) He had no knowledge of Plaintiff's medical condition. (*Id.* ¶ 8.) Nor did he treat or examine Plaintiff. (*Id.*) He was not employed by NDOC, and was not responsible for the preparation of any menu for the prison system. (*Id.* ¶¶ 7, 9.) He was not the chief medical officer for NDOC, as that was a different office. (*Id.* ¶ 10.) He does not recall having any direct conversations with Plaintiff related to his claims. (*Id.* ¶ 11.) He argues that there is no evidence that he was aware of a serious medical need, of a substantial risk of harm to Plaintiff, or that he disregarded such risk.

Plaintiff argues that as the Chief Medical Officer of the State of Nevada, under Nevada Revised Statutes (NRS) 209.382, 444.330 and 446.885, Dr. Dimuro was required to conduct inspections of State correctional facilities, including the nutritional adequacy of the diet of incarcerated offenders.[3]

In addition, on February 6, 2017, Plaintiff mailed Dr. Dimuro a letter explaining he had chronic hypertension and was on a low sodium diet. He requested and received portion values from NDOC and Boni, as well as a report detailing the Daily Reference Intake (DRI), Recommended Daily Allowance (RDA), Adequate Intake (AI) and recommended allowance levels received from the Food and Nutrition Board of the Institute of Medicine. He then documented each food item and portion size served with nutritional values for a 28-day meal cycle and compared it with the documentation from the Food and Nutrition Board. He sent this information to Hillary Gates with the U.S. Department of Health and Human Services. He

---

[3] NRS 209.382 requires the Chief Medical Officer to periodically examine and report upon, among other things, the nutritional adequacy of the diet of incarcerated offenders. NRS 444.330 provides that the Chief Medical Officer or authorized agent shall inspect NDOC at least once a year to carry out the supervision over sanitation, healthfulness, cleanliness and safety. NRS 446.885 provides that the healthy authority shall inspect each food establishment in the State at least once a year.

represented that Ms. Gates concluded that prisoners were not receiving nutritionally adequate meals. He provided Dr. Dimuro with a 28-day meal cycle from November 26, 2016 through December 23, 2016, and a calculation of the nutritional values, and claimed that they did not comport with the DRIs, RDAs, or AIs. (ECF No. 78 at 21-25.)

In response, Dr. Dimuro mailed Plaintiff a letter on February 13, 2017, stating he had received the correspondence and reviewed it, including the meal nutritional content breakdown. He noted that Plaintiff had copied the dietician (Ms. Boni) on the correspondence. Dr. Dimuro said he would reach out to the dietician to discuss the concerns raised in the letter, and requested that Plaintiff forward his correspondence with Ms. Gates. Dr. Dimuro also asked Plaintiff to comment on his overall health and elaborate on any evidence-based medical issues to which he attributed deleterious symptoms secondary to the claim of an inadequate diet. (ECF No. 78 at 27.)

In his reply, Dr. Dimuro argues that Plaintiff does not show he responded concerning the request for further information about his medical issues. Nor did Plaintiff provide a copy of the correspondence to Ms. Gates. Finally, Dr. Dimuro contends that Plaintiff has not shown he suffered substantial medical harm as a result of being served the menu.

Here, there is no question that Plaintiff advised Dr. Dimuro of his claim that he was not being served nutritionally adequate meals for his chronic hypertension at NDOC. The issue is whether Dr. Dimuro was deliberately indifferent in response. Dr. Dimuro said he would reach out to the dietician, and asked Plaintiff to supply further information about his health condition as well as his correspondence with Ms. Gates. Plaintiff does not provide evidence that he ever responded to Dr. Dimuro. There is no evidence in the record one way or the other regarding whether Dr. Dimuro reached out to the dietician. There is no evidence of any other

1  communication by Plaintiff with Dr. Dimuro. The court cannot conclude that Dr. Dimuro's

2  response to Plaintiff's letter, which asked Plaintiff to provide him with more information,

3  constitutes deliberate indifference.  Therefore, summary judgment should be granted in Dr.

4  Dimuro's favor.

5  **C. Albrecht, Egbert, Ellis and Paredes**

6        According to Defendants, Albrecht, Egbert, Ellis and Paredes are institutional cooks and

7  free staff, and have no input into the planning or sodium content of the menus. They are not

8  allowed to make any substitutions without the authority of Henry. None of them have any

9  recollection of discussing with Plaintiff any issues related to his meals. (Henry Decl.,

10 ECF No. 70-13 ¶ 15.)

11       Plaintiff argues that they admittedly served mainline dishes to low sodium prisoners on a

12 routine basis contrary to the predetermined low sodium menu. He claims that they cannot make

13 an informed decision as to any food substitution choices, but did so on a daily basis. He argues

14 that they personally participated by making changes to Plaintiff's low sodium diet without the

15 consent of a licensed nutritionist. He also contends that they failed to properly supervise inmate

16 workers preparing and serving meals. Plaintiff acknowledges that they may not have had input

17 into the menu planning or sodium content, but states they were responsible for not serving the

18 item on the menu.

19       To survive summary judgment, Plaintiff must raise a genuine dispute of material fact as

20 to whether these Defendants knew of and disregarded a serious risk to his health in serving him

21 his meals. Here, Plaintiff's claim centers on the allegation that the food served to him was not in

22 fact low in sodium. Defendants provide evidence that they are institutional cooks and free staff

23 and have no input in the menu planning or sodium content of the meals provided to inmates. In

1  addition, the evidence reflects that they are not allowed to make any substitutions without

2  Henry's authority. Finally, none of them recall discussing with Plaintiff any issues related to his

3  meals. While Plaintiff argues that they served him items that were not low in sodium, Plaintiff

4  has not provided any *evidence* in his response that these Defendants had any involvement with

5  respect to the sodium content of the food he was served,  that they knew the sodium levels of the

6  food Plaintiff was being served, or in fact served him items they knew were not low sodium.

7  Therefore, Plaintiff has failed to raise a genuine dispute of material fact as to whether they were

8  deliberately indifferent to his serious medical need, and summary judgment should be granted in

9  favor of Albrecht, Egbert, Ellis and Paredes.

10  **D. Henry**

11       Plaintiff alleges that Henry is the Food Services Manager, is not a registered dietician, is

12  required to follow a predetermined menu certified by a licensed dietician, and does not have the

13  training to make an informed decision regarding food substitution choices. He avers that she has

14  not followed the predetermined menu, and serves inmates on a low sodium diet food items that

15  are not on the certified menu plan. (ECF No. 54 at 14-16.)

16       In her declaration, Henry states that she has been employed by NDOC as the Food

17  Services Manager since November of 2004. (Henry Decl., ECF No. 70-13 ¶ 3.) The prison

18  culinary is a 24-hour operation, that she runs with the assistance of four additional "free staff."

19  (*Id*. ¶ 6.) She states that in 2019, NDOC at LCC was in a state of transition with the beginning of

20  a new menu service which was designed to make all the menus at the facility low sodium. (*Id*. ¶

21  7.) According to Henry, food item guidelines are set up by State purchasing under the guidelines

22  of a dietician contracted by the State to meet all federal requirements for mainline, medical and

23  religious diets. (*Id*.) There are eight types of medical diets, and all menus are approved by the

contracted dietician. (*Id*.) Since January 2020, all menus in the facility are considered low

sodium, and offer between 3000-4500 mg of sodium per day. (*Id*.)

Henry reviewed Plaintiff's canteen purchases, and notes that he purchased several items

clearly high in sodium, including pickles, crackers, peanut butter, peanut butter candy, popcorn,

pepperoni, and refried beans. (*Id*. ¶ 9.)

Henry further states that they do their best to deviate from the medical diet as little as

possible. (*Id*. ¶ 11.) Sometimes, they must make like-item substitutions, but they do not

substitute with a higher sodium product. (*Id*.) Under her supervision, the staff in the culinary

provide inmates, including Plaintiff, with three meals a day within menu guidelines. (*Id*. ¶ 12.)

The staff follow all medical diet orders provided by medical staff. (*Id*. ¶ 13.) She states that

Plaintiff receives meals in accordance with the licensed dietician approved menu for his needs.

(*Id*. ¶ 14.)

Finally, Henry argues there is no evidence the diet Plaintiff was provided at LCC posed a

risk of serious harm to his health, or that the diet he was served by Henry was connected to any

health issue. There are no notations in the medical records discussing the meals served by LCC

or that they were contributing to his ability to control his medical conditions. (ECF No. 72-1.)

Plaintiff argues that Henry has shown a propensity to use deception or manipulation to

avoid telling the truth. He points to a discovery response where she responded that she did not

say that Plaintiff just wants another payoff of some type, but then authored a memorandum to

Jeffrey Chandler about Plaintiff where she said exactly that. (ECF No. 78 at 19, Interrogatory 1

at ECF No. 78 at 33 and response at ECF No. 78 at 39.) He provides a letter from Deputy

Attorney General Rands, in response to Plaintiff's letter confronting him about this. Mr. Rands

states that prior to being provided with the memorandum (which he characterized as

confidential), Henry did not recall its contents, and she signed the responses as being correct to the best of her knowledge. (ECF No. 78 at 47.)

Plaintiff acknowledges that Henry has no input into the "predetermined" menus, and that she is not the dietician contracted to certify the menus. His claim is that she does not follow the predetermined menu by serving food items that are not on the menu that are high in sodium.

Plaintiff provides no *evidence* to support this claim that Henry served him off-menu items that were high in sodium. In fact, Plaintiff provides a grievance response by H. Wickham (not a defendant) as an exhibit to his amended complaint. Wickham told Plaintiff that it was acceptable to exchange a diet qualified item for another diet qualified item. He said that an occasional problem does happen, but it is corrected when brought to the attention of staff. The culinary staff (Henry, Albrecht, Egbet, Ellis and Paredes) were asked if Plaintiff had ever come to them with an issue regarding a meal. After looking at a photo of Plaintiff, they confirmed they had no memory of discussing a problem with a meal. (ECF No. 54 at 28.) This was also reiterated by Henry in her declaration. (Henry Decl., ECF No. 70-13 ¶ 15.)

Plaintiff's first amended complaint contains a grievance about his meals as an exhibit. He complained that: many of the meals he was supposed to be served were labeled "salt free" on the menu, but then he was provided the "mainline" meal; Henry would not provide him the nutritional information and ingredient list for chicken bologna that was being served to low sodium diet inmates in about half of the lunches; and, they were served hamburgers and other processed items too frequently. (ECF No. 54 at 49-50.)

The grievance response at the informal level from S. Baros (also not a defendant) advised Plaintiff that the low sodium chicken bologna was purchased and used in place of the mainline turkey and ham bologna for low sodium lunches. In addition, Baros stated that many of the

1   dinner items do state "salt free," and because most mainline meals such as beef stew and

2   stroganoff are made with  no added salt, those items are served to both mainline and low sodium

3   diet inmates. Insofar as he mentioned pizza, she clarified that they did not use a processed

4   cheese, but regular, low-fat mozzarella. She advised Plaintiff that they served the turkey burger

5   patties because they did not have access to "s/f peanut butter yet." She acknowledged that they

6   did serve the same items throughout the month, but this occurs whether the inmate is on mainline

7   or low sodium diet. She reiterated that there was no proof that LCC culinary workers

8   purposefully "shorted" any inmate's food. (ECF No. 54 at 42.)

9        The bottom line is that the evidence demonstrates that Henry served what was on the

10  predetermined menu, except when a mistake occurred on occasion, which was corrected when

11  brought to the attention of staff. Moreover, Plaintiff concedes that Henry did not have any input

12  into the sodium levels of the food on LCC's menus. Plaintiff does not provide a single example

13  of being served an item that was off-menu and high in sodium, and there is no evidence that

14  Henry purposefully served food items to Plaintiff that were not low sodium.

15       The court will now address Plaintiff's argument that Henry is known for making

16  deceptive statements. Henry may have told another prison employee that she thought Plaintiff

17  was setting up for another lawsuit, which contradicts her discovery response, but the substantive

18  portion of her memorandum to that other prison employee actually corroborates her declaration.

19  The memorandum states that it is acceptable to exchange a diet qualified item for another diet

20  qualified item when needed, usually because of product availability. She also said in the

21  memorandum that trays coming off the serving line meet or exceed all standards, and while an

22  occasional problem may occur, it is corrected when brought to the attention of staff. Finally, the

23  memorandum noted that she had Mr. Albrecht bring up a picture of Plaintiff and neither

Albrecht, Egbert, Ellis nor Paredes had a memory of ever being called out to discuss any issue Plaintiff was having with a meal. She confirmed that they would serve what is on the menu, indicating that sometimes the menu would call for a substitute and other times it would say omit, with no substitute stated. (ECF No. 78 at 19.)

There is no evidence that Henry was deliberately indifferent to Plaintiff's serious medical need; therefore, summary judgment should be granted in her favor.

**E. Boni**

Plaintiff alleges that Boni is a registered dietician who contracted with NDOC to analyze and certify that menus for meals served to inmates in NDOC's facilities are nutritionally adequate. Specifically, he avers that her certification that the 2013 Ely State Prison low sodium diet met the minimum requirements for DRIs was incorrect, and the sodium values were over twice the allowable amount recommended for a healthy individual not on a low sodium diet. He claims that the tolerable upper intake level for sodium is 2300 mg per day. Plaintiff alleges that he averaged 4283 mg of sodium per day, well above what is considered safe. He avers that he sent Boni a letter on February 6, 2017, advising her that he was being served a nutritionally inadequate meal, but she never contacted Plaintiff regarding his letter[4]. (ECF No. 54 at 11-13.)

According to her declaration, Boni is a registered dietician licensed in Nevada, and contracted with NDOC from 2005 until 2017. (Boni Decl., ECF No. 70-10 ¶¶ 1-2.) Her primary responsibility was to analyze the menus for NDOC facilities for their nutritional adequacy. (*Id.* ¶ 4.) She did not visit correctional sites, but her recommendations and verifications were based on menus she received from the NDOC purchasing division. The menus state the food item being

---

[4] Dr. Dimuro's response to Plaintiff's February 6, 2017 letter acknowledges that the dietician was copied on the letter.

served, the amount of food, and the nutritional breakdown. (*Id*. ¶ 5.) Using  nutritional analysis

software, she took the data and calculated the calories, cholesterol, sodium, fiber, iron, calcium,

vitamin A, vitamin C, protein, total fat and saturated fat for appropriate and necessary intake

averaged over one week's time. (*Id*.) She uses RDAs and DRIs as established by the Food and

Nutrition Board Institute of Medicine, National Academies, which she says are the standards of

practice used by all credible practitioners in the field. (*Id*. ¶ 6.)

She acknowledges that she received the 2013 LCC low sodium menu from NDOC

purchasing for review. Even though the specific numbers for the low sodium menu were not

provided to determine a detailed nutritional adequacy, she is comfortable with her verification

based on her professional knowledge and background on these menus. The menu was based on

the LCC main men's menu, which was analyzed and calculated for nutrients, as mentioned

above. Minor changes were made to the low sodium menu, primarily, serving most foods with

little or no salt, and replacing high salt items with lower salt alternatives. (*Id*. ¶ 7.) She states that

the menu is an adequate low sodium diet. (*Id*. ¶ 8.) According to Boni, she would not certify any

menu received by NDOC if it did not meet the minimum guidelines of nutritional adequacy

guidelines set forth by the Food and Nutrition Board Institute of Medicine, National Academies.

(*Id*. ¶ 9.) Finally, she denies having personal knowledge of Plaintiff or his medical condition

prior to this case being filed. (*Id*. ¶ 10.)

Plaintiff argues that Boni put in place policies that allowed a menu to be served that was

not low in sodium. He points out that Boni said she received the 2013 menu for review but the

specific numbers were not provided. He questions how she truly knew it was low sodium. He

also says that in a June 7, 2011 certification letter, she stated that the values for sodium,

cholesterol and protein appeared to be on the high side, and according to the average American

diet, this meal pattern was very typical. She went on to state that over a long period of time, these excesses may be indicative of health problems, such as obesity, heart disease, and diabetes. (ECF No. 78 at 49.)

Plaintiff includes as an exhibit the DRIs and tolerable upper intake levels from the Food and Nutrition Board, Institute of Medicine, National Academies. For men above the age of 13, the level for sodium is 2.3 grams or 2300 milligrams. (ECF No. 78 at 29.) The document states that a tolerable upper intake level is the highest level of a daily nutrient intake that is likely to pose no risk of adverse health effects to almost all individuals in the general population. (*Id*.) Plaintiff also provides a printout from Wikipedia that defines a "low sodium diet" as including no more than 1500 to 2400 milligrams of sodium per day. (ECF No. 78 at 53.)

In her reply, Boni argues there is no evidence that it was within her authority to review, approve or change an individual prisoner's diet, or that she supervised those who had such authority. Instead, Boni reviewed and analyzed menus prepared by NDOC purchasing division, and certified that the diet is an adequate low sodium diet. She contends that Plaintiff has not provided a dietician or specialist to opine to the contrary, and he has not demonstrated he has suffered medical harm as a result.

As Plaintiff points out, in her letter certifying the NDOC men's menu for July 2-29, 2011, Boni did acknowledge that the levels for sodium, cholesterol and protein appeared to be on the high side. She said that according to the average American diet, this meal pattern was very typical. Importantly, she noted that "[o]ver a long period of time, these excesses may be indicative of health problems, such as obesity, heart, and diabetes." (ECF No. 78 at 49.)

Boni does not address the letter Plaintiff sent to Dr. Dimuro that was copied to her or the attached calculation of sodium levels for meals served from November to December of 2016, where daily sodium levels were calculated to be between 3148 and 5462 milligrams, with more than half of those being above 4000 milligrams. Nor does she mention the tolerable upper intake levels of 2300 milligrams for men over the age of 13 that Plaintiff submits from the Food and Nutrition Board, Institute of Medicine, National Academies (which Boni said set the standard of practice for all credible practitioners in the field).

Plaintiff has raised a genuine dispute as to whether menus Boni certified were nutritionally adequate for a low sodium diet. Boni states that she uses standards from the Food and Nutrition Board Institute of Medicine, National Academies, but Plaintiff has provided evidence that those standards cap sodium levels at 2300 milligrams per day. In addition, Boni states that she had no knowledge of Plaintiff or his medical condition, but Plaintiff submits a letter that she was copied on in February of 2017 that specifically described his chronic hypertension, his claim that the meals he was being served were nutritionally inadequate, and an attached calculation of sodium levels for meals served in November to December of 2016 that were nearly all above 4,000 milligrams. Boni, also certified a menu in 2011, acknowledging that sodium levels were high. In fact, she specifically stated that over a long period of time, these excesses may be indicative of health problems.

Insofar as this could be considered as raising a difference of opinion, that statement in itself is evidence that over time, excess sodium could cause health problems. As the Seventh Circuit stated, prison officials "are not excused from ensuring adequate treatment for inmates with chronic or degenerative conditions simply because any resulting harms may remain latent or have not yet reached the point of causing acute or life-threatening injuries." *McDonald v. Hardy*,

821 F.3d 882, 889 (7th Cir. 2016) (citing *inter alia*, *Ortiz v. City of Chicago*, 656 F.3d 523, 526,

533 (7th Cir. 2011) (diabetes, thyroid condition, hypertension, and asthma). "Indeed, it is

precisely the latent and incremental nature of the harms associated with such conditions that

makes the provision of adequate medical care so important." *Id*.[5]

For these reasons, summary judgment should be denied as to Boni.

**F. Cowee**

Plaintiff alleges that Cowee is a registered dietician and contractor for NDOC whose

responsibility is to analyze and certify that the menus served to NDOC inmates are nutritionally

adequate. He avers that she certified the low sodium diet as nutritionally adequate when that was

false.

According to her declaration, Cowee has contracted with NDOC as a dietician since

2018. (Cowee Decl., ECF No. 70-11 ¶ 3.) She states that she was not the contract dietician at the

time Plaintiff's claims arose, and did not certify the menus of which he complains. (*Id.* ¶ 6.) In

2019, NDOC instituted a change designed to make all menus at their facilities low sodium, and

she assisted the purchasing  division with guidelines to substitute lower sodium alternatives to all

of the menus. (*Id.* ¶ 7.) At this time, she maintains that all meals are low sodium at 3000-4500

milligrams per day. (*Id.* ¶ 8.)

Plaintiff argues that as the current dietician, Cowee has continued with the same policies

as former dieticians and has certified the menu as low sodium when the upper limit for sodium is

---

[5] The Seventh Circuit cited a study showing that there is significantly higher prevalence of hypertension, asthma, arthritis, cervical cancer and hepatitis in prisons: Ingrid A. Bingswanger, *Chronic Medical Diseases Among Jail and Prison Inmates*, CORRECTIONS.COM (Oct. 25, 2010, http://www.corrections.com/news/article/26014–chronic–medical–diseases–among–jail–and–prison–inmates, last visited November 23, 2020.

1   2300 milligrams, so the meals that contain 3000-4500 milligrams of sodium per day are not low

2   sodium.

3        While Cowee was not the contract dietician when Plaintiff's claims initially arose,

4   Plaintiff filed his amended complaint on October 31, 2019, containing the allegations against

5   Cowee. (ECF No. 54.) An answer was filed on November 21, 2019. (ECF No. 55.) Cowee was

6   served, and then filed a joinder to the answer. (ECF No. 65.)[6]

7        Nevertheless, in contrast to his claim against Boni, there is no evidence in the record that

8   Plaintiff specifically put Cowee on notice of his chronic hypertension or advised her that the diet

9   he was receiving once she was contracted with NDOC was not in fact low sodium. Nor is there

10   evidence in the record of the specific nutritional value of the food items Plaintiff was served

11   while Cowee was contracted with NDOC. Therefore, summary judgment should be granted in

12   favor of Cowee.

13   **F.  Qualified Immunity**

14        Defendants argue they are entitled to qualified immunity because none of them were on

15   notice that there was a risk of health consequences to Plaintiff based on the menu provided by

16   the registered dieticians. In addition, they assert that the dieticians had no knowledge of

17   Plaintiff's condition.

18        In light of the recommendations made above, the court need only address the qualified

19   immunity argument with respect to Boni: that she had no knowledge of Plaintiff's condition.

20   (ECF No. 70 at 11.) Plaintiff has provided evidence, however, that he sent Boni a letter in

21

22

23

---

[6] The joinder references the answer to the original complaint (ECF No. 37), even though an answer was filed to the first amended complaint (ECF No. 55).

February of 2017, alerting Boni to his chronic hypertension and claim that he was not receiving a low sodium diet. Therefore, Boni is not entitled to qualified immunity on this basis.[7]

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING** the motion for summary judgment (ECF No. 70) as to defendants Albrecht, Cowee, Dimuro, Egbert, Ellis, Henry and Paredes, and **DENYING** the motion as to defendant Boni.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: November 25, 2020

William G. Cobb

William G. Cobb
United States Magistrate Judge

---

[7] Boni did not argue, and therefore the court did not consider, whether the law was clearly established with respect to Plaintiff's claim against Boni.